George G. **GUAGENTI,** Plaintiff–
Appellant,

v.

**JAMES N. GRAY CO.,** Defendant–
Appellee.

No. 03–6034.

United States Court of Appeals,
Sixth Circuit.

July 9, 2004.

Elizabeth S. Hughes, Gess, Mattingly & Atchison, Lexington, KY, for Plaintiff–Appellant.

Richard G. Griffith, Jeffrey J. Chapuran, Stoll, Keenon & Park, Lexington, KY, for Defendant–Appellee.

Before: MARTIN and SUTTON, Circuit Judges; and HOLSCHUH, District Judge.*

SUTTON, Circuit Judge.

George G. Guagenti sued his former employer, the James N. Gray Company (the "Gray Company" or the "company"), alleging several violations of state and federal law stemming from his termination in February of 2001. The district court granted summary judgment to the company on all but one of Guagenti's claims, and the parties settled the remaining claim prior to trial. On appeal, Guagenti challenges the district court's resolution of two of his state-law claims—first, his breach-of-contract claim that the company failed to give him fringe benefits as part of his severance package and, second, his claim that he earned a bonus under Kentucky Revised Statutes § 337.055 that the company has failed to pay. Finding no error in the district court's resolution of these issues, we affirm.

I.

A.

George Guagenti worked as a sales representative for the Gray Company, a construction firm located in Cincinnati, Ohio. In 1994, the company offered to transfer

---

* The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

Guagenti to its Lexington, Kentucky headquarters, where it was hoped he eventually would succeed Alan Fowler as Gray's Vice President of Business Development once Fowler retired. Guagenti accepted the offer and proceeded to negotiate the terms of his transfer.

In negotiating the transfer, Guagenti proposed the following "Term of Employment" severance clause:

> The term of employment is intended to be at the will of the employer and the employee; however, if employment is terminated without cause, employee shall be entitled to additional compensation as follows: 1) If termination occurs before November 1, 1995, additional compensation will be equal to six (6) months pay. 2) If termination occurs after November 1, 1995, additional compensation will be equal to twelve (12) months pay. *Cause* will be defined as any act which is a willful disregard for the company's well being.

JA 29. The company accepted the proposal. The 1994 agreement also listed Guagenti's "base salary" as $90,000 per year and provided for a number of fringe benefits, including country club membership dues, a company car, eligibility for the company's bonus plan, and health and life insurance.

In 2000, Fowler resigned, but the company replaced him with Tim Lingeman, not Guagenti. Soon after this development, Guagenti negotiated a new employment contract with the company. The 2000 agreement occupied a single page and had two key provisions: (1) it set Guagenti's "salary" at $156,000 per year, and (2) it incorporated the 1994 agreement's "Term of Employment" provision. Although the 2000 agreement did not mention the 1994 perquisites, the company continued to provide them.

Guagenti and Lingeman soon had difficulty working together, and the company terminated Guagenti on February 5, 2001. The company did not dispute whether it had cause to terminate Guagenti and in accordance with his employment contract paid him $156,000 in severance—a full twelve months' salary.

### B.

Guagenti filed suit in state court, claiming that the company violated several state laws by failing to pay him his fringe benefits and a bonus (on top of his $156,000 severance payment) and violated the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), 29 U.S.C. § 1161 *et seq.*, by terminating his medical benefits. The company removed the case to the Eastern District of Kentucky based on federal-question jurisdiction. 28 U.S.C. § 1331.

The parties settled one claim, and the district court rejected the remaining claims in granting the company's motion for summary judgment. Of relevance to this appeal, the district court first rejected Guagenti's state-law contract claim that the 12 months of "pay" to which his employment agreement entitled him included his employment perquisites (*e.g.,* health insurance, country club dues, the company car). After noting that most cases addressing the issue did not include the value of fringe benefits in the definition of pay, compensation or salary, the court reasoned that Guagenti at most established an ambiguity in the provision and that Kentucky law required it to construe that ambiguity against Guagenti, the drafter of the employment-contract provision.

Also of relevance to this appeal, the district court rejected Guagenti's claim that he "earned" a bonus by working for four months of the fiscal year that ran from September 30, 2000 to September 30, 2001. *See* Ky.Rev.Stat. § 337.055. Accord-

ing to the court, Guagenti participated in the company's bonus plan, but the plan paid a bonus based on the company's performance during the prior full fiscal year. Because Guagenti was not an employee in any position at the time the company paid its annual bonus (10 months after his termination), the court concluded that he did not "earn" a bonus under Kentucky Revised Statutes § 337.055.

## II.

We review the district court's summary judgment decision de novo. *See Ammex, Inc. v. United States,* 367 F.3d 530, 533 (6th Cir.2004). The parties agree that Kentucky law governs the contract claim and the bonus claim. Under Kentucky law, the parties also agree that the interpretation of a contract generally presents a question of law that courts may decide, *see Morganfield Nat'l Bank v. Damien Elder & Sons,* 836 S.W.2d 893, 895 (Ky. 1992), and that any ambiguities in a contract generally must be construed against the drafter, *see Wiggins v. Schubert Realty & Inv. Co.,* 854 S.W.2d 794, 796 (Ky.Ct. App.1993).

## A.

■ Guagenti first argues that the severance provision in the 1994 and 2000 agreements covers fringe benefits. We disagree.

By its terms, the severance provision does not extend to fringe benefits in general or to these fringe benefits in particular. Drafted by Guagenti, the 1994 agreement contained the following severance clause:

> The term of employment is intended to be at the will of the employer and the employee; however, if employment is terminated without cause, employee shall be entitled to additional compensation as follows: 1) If termination occurs before November 1, 1995, additional

compensation will be equal to six (6) months pay. 2) If termination occurs after November 1, 1995, *additional compensation will be equal to twelve (12) months pay. Cause* will be defined as any act which is a willful disregard for the company's well being.

JA 29 (emphasis added). The 2000 agreement, which Guagenti seeks to enforce here, incorporates this clause.

Under the 2000 agreement, then, termination without cause after November 1, 1995, entitled Guagenti to "additional compensation," which the agreement defines as "equal to twelve (12) months pay." Under Kentucky case law, "additional compensation" by itself generally does not extend to fringe benefits. *See Caldwell County Fiscal Ct. v. Paris,* 945 S.W.2d 952, 954 (Ky.Ct.App.1997) (loss of health insurance benefits did not amount to a reduction in "compensation" under the Kentucky Constitution); *Cook v. Chilton ex rel. Bd. of Trs.,* 390 S.W.2d 656, 657 (Ky.Ct.App.1965) (mandatory contribution to retirement fund did not constitute a change in "compensation" for purposes of Kentucky Constitution).

In this instance, because the agreement defines "compensation" more narrowly as solely "equal to twelve (12) months pay," Guagenti faces an even more formidable challenge. Neither twelve months' "pay" nor the earlier reference in the agreement to six months' "pay" naturally covers fringe benefits. *See Webster's II New College Dictionary* (2001) (defining "pay" as "money given in return for work done"). Case law is to the same effect. *See Gentile v. City of Detroit,* 139 Mich.App. 608, 362 N.W.2d 848, 852 (Mich.Ct.App.1984) ("[I]n common parlance [medical benefits] are considered true 'fringe benefits' and not a part of pay or compensation."); *Mason v. Ret. Bd.,* 111 Cal.App.4th 1221, 4 Cal.Rptr.3d 619, 624 (Ct.App.2003) ("[T]he

Board was not obligated to assign a value to and to include in the calculation of 'average final compensation' a benefit [like accrued vacation days] that does not have a cash value during the specified measuring period.").

On top of this, Guagenti acknowledges that "pay" equals "salary." Appellant Reply Br. at 5. The 2000 agreement provides for an annual "salary" of $156,000, which is precisely what Guagenti received upon his termination as twelve months of "pay." That the 1994 agreement referred to a "base salary" makes no difference—first, because that is not the agreement he seeks to enforce and, second, because there is nothing incompatible with treating both a "salary" and "base salary" as being the twelve months of "pay" to which Guagenti was entitled upon termination. At most Guagenti's contrary argument proposes a reason for finding ambiguity in the agreement, not a reason for treating "salary" as something other than an employee's annual pay, and any such ambiguity must be construed against him. *See Wiggins,* 854 S.W.2d at 796.

### B.

■ Guagenti next claims that he was entitled to a bonus under Kentucky statutory law. We again disagree.

In accordance with Kentucky Revised Statutes § 337.055:

Any employee who leaves or is discharged from his employment shall be paid in full all wages or salary earned by him; not later than the next normal pay period following the date of dismissal or voluntary leaving or fourteen (14) days following such date of dismissal or voluntary leaving whichever last occurs. Any employee who is absent at the time fixed for payment by an employer, or who, for any other reason, is not paid at that time, shall be paid thereafter at any time or upon fourteen (14) days' demand. No employer shall, by any means, secure exemption from this section.

The term "wages" includes "earned bonuses" within its definition, Ky.Rev.Stat. § 337.010(1)(c), which indeed advances Guagenti's argument. What does not advance his argument is the fact that the statute requires the company only to pay "earned bonuses" within fourteen days of his termination; it does not explain whether an employee has earned a bonus. In other words, the statute requires companies to pay earned bonuses promptly after an employee ends his or her employment; it does not mandate what bonuses, if any, should be paid. *Cf. Berrier v. Bizer,* 57 S.W.3d 271, 281 (Ky.2001) (noting that Kentucky Revised Statutes § 337.055 requires payment of wages including "vested vacation pay," but "[n]o Kentucky statute requires an employer to compensate an employee for accumulated vacation time," and "[v]acation pay is purely a matter of contract between employer and employee").

Guagenti's bonus claim, then, turns on the terms of the company's bonus plan. The plan awards bonuses to eligible employees and defines its objectives and eligibility criteria as follows:

[The plan] is based upon the premise that a specific, formula driven incentive payment will be made to participants if the company reaches certain target levels of performance.

Eligibility for the plan is based upon the individual's position within the company, their role and level of responsibility, and experience either within or outside Gray. The Compensation Committee will make the final determination of whether or not a position or an individual may be granted participation in the plan.

JA 211. The parties agree that "target levels of performance" refer to the compa-

ny's performance during each fiscal year and that the company customarily pays bonuses three months after each fiscal year ends.

Guagenti meets none of the contractual requirements for participation in the bonus plan. When the company determined who was eligible for a bonus at the end of the fiscal year in September 2001, Guagenti did not hold a position with the company (he was terminated in February) and the Compensation Committee thus did not allow him to participate in the plan for that fiscal year. The plan does not provide for partial bonuses and does not provide any method of calculating something less than a bonus based on fiscal-year performance. The company offered evidence that it does not award, and has never awarded, pro rata bonuses. And Guagenti failed to rebut this evidence by pointing to a single instance in which the company paid out a pro rata bonus. Still less has he shown how a bonus plan under which "[t]he Compensation Committee will make the final determination" of eligibility gives an employee who worked four months of the previous year an enforceable right to obtain a bonus.

Under these circumstances, it makes no difference whether Guagenti provided consideration for the bonus plan by signing a non-compete agreement. The fact is, he did not meet the customary eligibility requirements of the plan, and the Compensation Committee did not exercise whatever discretion it had to make such bonus payments to part-year employees, something at any rate it had never done before. Nor may Guagenti alter this conclusion by invoking the "implied covenant of good faith and fair dealing," which he claims applies to this contract. Because he has not identified a provision of the plan requiring such a bonus and because he has not identified a single other employee who received a pro rata bonus for working part of the past fiscal year, he has no equitable or factual premise for invoking this doctrine.

### III.

For the foregoing reasons, we affirm.